# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 20, 2005      Decided February 28, 2006

No. 04-5418

NATIONAL LABOR RELATIONS BOARD,
APPELLEE

v.

COOPER TIRE & RUBBER COMPANY,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 03mc03898)

———

*Michael McMenamin* argued the cause for appellant. With him on the briefs were *Nancy A. Noall* and *Morris L. Hawk*. *Jennifer J. Illingworth* entered an appearance.

*Stanley R. Zirkin*, Assistant General Counsel, National Labor Relations Board, argued the cause for appellee. With him on the brief was *Helene D. Lerner*, Trial Attorney.

Before: HENDERSON, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Dissenting opinion filed by *Circuit Judge* GRIFFITH.

BROWN, *Circuit Judge*: The threshold issue in this case is whether the United States District Court for the District of Columbia had jurisdiction to enforce subpoenas issued by the National Labor Relations Board ("NLRB") in the course of the NLRB's investigation of appellant Cooper Tire & Rubber Company ("Cooper Tire") for possible contempt of a 1992 cease-and-desist order. We conclude that the district court lacked jurisdiction, and therefore we vacate its order without addressing the other issues Cooper Tire raises.

I

In the late 1980s, activities surrounding an unsuccessful union-organizing campaign at Cooper Tire's manufacturing plant in Tupelo, Mississippi, led to an unfair labor practice charge, an NLRB finding against Cooper Tire, and a cease-and-desist order. Cooper Tire appealed the order to the Fifth Circuit, and the Fifth Circuit ruled in favor of Cooper Tire on several points, narrowing the cease-and-desist order significantly. *Cooper Tire & Rubber Co. v. NLRB*, 957 F.2d 1245, 1252 & n.11, 1257 & n.23 (5th Cir. 1992). After a subsequent amendment, the Fifth Circuit's 1992 judgment barred Cooper Tire from:

> (a) Maintaining and enforcing a no-solicitation rule that bans solicitation during any break times or in any break areas . . . when both the solicitor and solicitee are on break time, whether informal or scheduled, and are in a break area.
> (b) Suspending, discharging, or otherwise disciplining its employees for violations of a no-solicitation rule that bans solicitation during any break times or in any break areas . . .

when both the solicitor and solicitee are on break time, whether informal or scheduled, and are in a break area.
(c) Creating the impression that its employees' union activities are under surveillance.
(d) Threatening its employees with reprisals because of their union activities.
(e) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the National Labor Relations Act . . . .

In 2002, United Steel Workers of America ("the Union") began a new campaign to unionize employees at Cooper Tire's Tupelo plant. Prior to the election, Cooper Tire showed certain videotapes to its employees. According to Cooper Tire, the employees voted against the Union, 641 to 329. The Union then filed an unfair labor practice charge, complaining that, during the union-organizing campaign, Cooper Tire prohibited leafleting activities inside the parking area of the plant, surveilled pro-union employees as they distributed leaflets, and focused a surveillance camera on these same employees. The NLRB regional office referred the matter to the NLRB's Contempt Litigation and Compliance Branch ("Contempt Branch") here in Washington, D.C., for a determination as to whether Cooper Tire had acted in contempt of the 1992 cease-and-desist order. The Contempt Branch then subpoenaed records related to security at the Tupelo plant. Cooper Tire responded to the subpoena, sending the requested records to the Contempt Branch offices in Washington, D.C., and the Contempt Branch subsequently took depositions of several security guards.

In April 2003, the Contempt Branch issued two more subpoenas, seeking the videotapes Cooper Tire showed to employees during the 2002 union-organizing campaign and

information surrounding the showing of these tapes. (The subpoenas sought other items, but disputes as to those items have been resolved.) What was unusual about the Contempt Branch's new subpoenas (and what forms the basis of Cooper Tire's appeal) is that no party had ever filed a *charge* asserting any unlawful practice with respect to the showing of the videotapes, and the six-month period for filing such a charge had elapsed. In Cooper Tire's view, the NLRB was attempting to circumvent the statute of limitations by characterizing the videotapes as a violation of the 1992 cease-and-desist order.

Cooper Tire filed a petition with the NLRB to revoke the subpoenas, and the NLRB denied this petition on October 24, 2003. A few days later, Cooper Tire informed the Contempt Branch that it would not comply with the subpoenas, and on December 16, 2003, the Contempt Branch filed an application in the United States District Court for the District of Columbia, seeking to enforce the subpoenas. The district court referred the matter to a magistrate judge.

On January 16, 2004, Cooper Tire moved to dismiss for lack of subject matter jurisdiction, or in the alternative to transfer the matter to the Northern District of Mississippi. Cooper Tire also challenged the subpoenas on their merits, claiming they exceeded the investigatory authority of the NLRB.

On March 29, 2004, the magistrate judge ruled (1) the district court had jurisdiction, (2) venue in the District of Columbia was appropriate, and (3) the Contempt Branch had authority to issue the subpoenas. On May 10, 2004, the magistrate judge denied Cooper Tire's motion for reconsideration. On May 20, 2004, Cooper Tire appealed the magistrate judge's order to the district court, and the district court rejected the appeal on September 2, 2004, ordering Cooper

Tire to comply with the March 29, 2004 order. Cooper Tire then filed this appeal.

II

29 U.S.C. § 161(2) permits the NLRB to apply to enforce a subpoena before the district court "within the jurisdiction *of which the inquiry is carried on* or within the jurisdiction of which said person guilty of contumacy or refusal to obey is found or resides or transacts business." (Emphasis added.) A very similar subpoena enforcement provision appears in the governing statutes of several other federal administrative agencies. To establish the jurisdiction of the United States District Court for the District of Columbia, the NLRB relies on a broad reading of the phrase "inquiry is carried on." The NLRB reasons that its Contempt Branch is located in the District of Columbia, and therefore the inquiry is being carried on in the District of Columbia. The NLRB's interpretation would, of course, give the NLRB the choice of any forum it liked, simply by locating its investigation in that jurisdiction, though as a practical matter the NLRB's choice is more limited because its Contempt Branch is located in the District of Columbia. In any case, the NLRB's interpretation would allow the NLRB to pick a forum convenient to its legal staff, while possibly forcing the subpoenaed party to go to court in a distant and inconvenient jurisdiction.

Cooper Tire reads the phrase "inquiry is carried on" in § 161(2) more narrowly, focusing on the *subject matter* of the inquiry. Cooper Tire argues the "inquiry" relates only to the union-organizing activities at its Tupelo plant, and therefore Mississippi is the "jurisdiction of which the inquiry is carried on." 29 U.S.C. § 161(2). No one is investigating anything that happened in the District of Columbia, Cooper Tire asserts; rather, the Contempt Branch just happens to be located there.

The opposite inferences the litigants draw from the language of the statute are both at least plausible, and therefore they establish one point: the phrase "within the jurisdiction of which the inquiry is carried on" is ambiguous. Certainly, if an actual hearing is underway before an administrative law judge, and evidence is being presented for the judge to examine on the record, then the location of that hearing is the location of the inquiry. *FTC v. Browning*, 435 F.2d 96, 99 n.7 and 100 (D.C. Cir. 1970); *see also U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245 (D.C. Cir. 2005); *FTC v. MacArthur*, 532 F.2d 1135 (7th Cir. 1976). In that case, the "inquiry" is the hearing itself, and the evidence to be offered at the hearing is the subject matter of the inquiry.

Quite a different question is presented, however, where no formal hearing is underway, and the agency has issued the subpoena as part of a preliminary investigation of possible wrongdoing. In that case, the investigators might be in one place, the matter under investigation might be in another, and the location of the "inquiry" might be one, the other, or both. Of course, the NLRB's regional offices often conduct investigations, but the NRLB has chosen to conduct contempt investigations in Washington, D.C., which in this case has placed its investigators a great distance from the matter they are investigating. Where, in those circumstances, is the inquiry "carried on"?

*Browning* supports a broad reading of § 161(2) that would include the location of the investigative office as one of the places where the inquiry is carried on. If a *hearing* located in Washington, D.C., gives the district court in Washington, D.C., jurisdiction to enforce agency subpoenas, *see Browning*, 435 F.2d at 100, then why not an *investigating office* located in Washington, D.C.? *Browning*, however, is not the only precedent on point, and in fact it is not the most relevant

precedent. Where the inquiry is an agency investigation, not a formal hearing, we focus on, among other things, the location of the *subject matter* of the inquiry. *FEC v. Comm. to Elect Lyndon La Rouche*, 613 F.2d 849, 856-57 (D.C. Cir. 1979). This focus is not a gloss on the statutory terms that alters their plain meaning; rather, it is our effort to define those terms. Specifically, we have articulated a two-part test for determining the location of an investigative inquiry for purposes of district court jurisdiction to enforce agency subpoenas: "(1) whether [the location bears] a sufficiently reasonable relation to the subject matter of the investigation . . . , and (2) whether the agency's choice of this [location for enforcement] . . . exceed[s] the bound of reasonableness." *Id.* (internal quotation marks and citation omitted); *cf.* dis. op. at 11 (relying on the location of the Contempt Branch's office, rather than the subject matter of the inquiry, to satisfy the first part of the two-part test).

In *La Rouche,* the court concluded that enforcement in the District of Columbia was proper because of the nexus between the District and the Federal Election Commission's investigation. The court noted the FEC's Washington, D.C., headquarters was the "hub" of its national investigative activity. *La Rouche*, 613 F.2d at 857. The court also identified several factors that aid in the application of the two-part test, *id.* at 855, and *ASAT*, 411 F.3d at 249, further clarified these factors, listing them as follows:

> the place where the [agency] held its hearing, the place where it made the decision to authorize the investigation, the place where the subpoenas were issued, the place where its correspondence emanated, the place where the [agency] determined that unlawful actions had occurred, the location of the documents and witnesses, and the location of the headquarters of the subpoenaed company.

*Id*. Significantly, these factors are not weighted against one another, and *ASAT* did not suggest a simplistic tallying of factors would be determinative. The first four factors, for example, favor the convenience of the agency, but in this context, the burden on the subpoenaed party might be a more significant consideration. Moreover, the factors do not replace the test. The crucial question remains whether the jurisdiction bears a "reasonable relation to the subject matter of the investigation," for it was our determination in *La Rouche* that the subject matter of an investigation is an important consideration in locating the investigation. 613 F.2d at 856-57.

The parties emphasize different aspects of the *La Rouche* analysis. Cooper Tire emphasizes the *La Rouche* court's specific reference to the "subject matter" of the inquiry. Even if the *inquiry* is arguably taking place in the District of Columbia (by reason of being directed out of the NLRB's Contempt Branch office in Washington, D.C.), the *subject matter* of the inquiry is surely located in Mississippi. Moreover, Mississippi is in the Fifth Circuit, which is the court that issued the cease-and-desist order that is the basis of the alleged contempt, and Mississippi is also where the subpoenaed party is located. The NLRB, on the other hand, relies on the several factors that tie its investigation to the District of Columbia: (1) its Contempt Branch is located in the District of Columbia, (2) it issued its subpoenas in the District of Columbia, (3) it sent letters to Cooper Tire from the District of Columbia, and (4) Cooper Tire responded to the Contempt Branch's earlier subpoena by sending records and correspondence to the District of Columbia. These factors, of course, do not make the District of Columbia the location of the inquiry if (as *La Rouche* requires) we must consider whether there is a reasonable relation to the *subject matter* of the inquiry, not merely whether the agency has chosen it as the *command center* of the inquiry.

The NLRB and our dissenting colleague argue strenuously that this court has repeatedly found agency subpoenas properly enforced in the District when the subject matter of the investigation—the alleged violation or misconduct—occurred elsewhere. True. *See ASAT*, 411 F.3d 245; *La Rouche*, 613 F.2d 849; *Browning*, 435 F.2d 96; *see also FTC v. Cockrell*, 431 F. Supp. 558 (D.D.C. 1977) (cited approvingly in *La Rouche*, 613 F.2d at 855-56). However, every one of these cases involved an investigation that encompassed multiple jurisdictions and could be characterized as nationwide in scope. When an investigation is nationwide in scope, its subject matter is not located in any particular place, and the location of the investigating office may well be the most reasonable choice for purposes of subpoena enforcement. This case is different. The investigation concerns a single employer and a single dispute related to union-organizing activity at a single plant. The subject matter of this inquiry *is* located in a particular place, and that place is Tupelo, Mississippi. Therefore, if we accept the NLRB's argument, we will not be following precedent; we will be breaking new trail.

The facts of *La Rouche* are informative. That case involved a Federal Election Commission investigation of the Committee to Elect Lyndon La Rouche, focusing on whether Lyndon La Rouche qualified for federal matching funds. 613 F.2d 851. The FEC was located in Washington, D.C., but much of the subject matter of the investigation was in New York. *Id.* at 851-53. Therefore, factually the case was somewhat like the one before us. The FEC successfully enforced its subpoena in the district court for the District of Columbia, and this circuit affirmed. *Id.* Our opinion, however, focused particularly on the fact that the FEC was conducting a *nationwide* investigation, with the District of Columbia as the "hub" of that investigation. *Id.* at 857. Specifically, the FEC was inquiring into possible improprieties of a *national* political party in its certified record

of donations from *twenty* states, prepared in the course of a *national* political campaign.  In the course of its investigation, the FEC conducted field interviews in Delaware, Massachusetts, Wisconsin, and Indiana, as well as an audit of records in New York.  *Id*. at 857-58.  Though many of the activities under investigation took place in New York, we concluded that the nationwide scope of the investigation justified jurisdiction in the District of Columbia where the investigative office was located.  *Id*. at 855-58.  Our analysis could not have been more clear that the nationwide scope of the investigation was determinative.  In the course of our discussion of existing circuit precedent, we emphasized that "each [case] involv[ed] an essentially nationwide investigation conducted from an agency's national office."  *Id*. at 855.  We then selected quotations from these precedents (including *Browning*) that emphasized the national scope of the investigations at issue.  *Id*. at 855-56.  Finally, in applying these precedents, we noted that the case before us also involved an "investigation [that] was not localized . . . but rather was nationwide in scope."  *Id*. at 857.  We concluded: "It is our view that here, as in [prior cases from our circuit], the Commission was conducting an essentially nationwide investigation from its national office in the District of Columbia and, *accordingly*, it should be afforded broad discretion in selecting this jurisdiction as its place of inquiry."  *Id*. at 858 (emphasis added).

Significantly, in *La Rouche*, we chose to distinguish, rather than disapprove, *FTC v. Western General Dairies, Inc.*, 432 F. Supp. 31 (N.D. Cal. 1977), in which the district court in the Northern District of California, applying a similar jurisdictional provision, held that it lacked jurisdiction to enforce subpoenas issued as part of an investigation of matters in Utah and Idaho, even though the investigation was being conducted from an office in the Northern District of California.  In *La Rouche*, we agreed with the reasoning of *Western General Dairies* and

distinguished it, explaining that the FEC could exercise jurisdiction in the District of Columbia because a *nationwide* investigation was being centrally directed from the District of Columbia. *La Rouche*, 613 F.2d at 857 n.8. Our careful effort to distinguish *Western General Dairies*, rather than simply to reject the reasoning of that case, indicates we found the case persuasive and is further evidence our holding in *La Rouche* hinged upon the investigation having a national scope.

The NRLB relies on *ASAT*, arguing that where agency investigations are carried out by an office in the District of Columbia, "the district court for the District of Columbia often, if not always, would have subject matter jurisdiction." 411 F.3d at 250. *ASAT*, however, involved a formal hearing being conducted in the District of Columbia, not just a preliminary investigation. That fact made it analogous to *Browning*, in which we stated that the location of a formal adjudicatory hearing is the place of the inquiry for purposes of subpoena enforcement. *Browning*, 435 F.2d at 99 n.7 and 100. Moreover, *ASAT* merely applied and reaffirmed our previous holding in *La Rouche*; it did not call into question any of the reasoning of *La Rouche*. The NLRB is correct that, in deciding *ASAT*, we put little emphasis on *La Rouche*'s clear requirement that an investigation must be nationwide in scope to justify subpoena enforcement in a district that has no connection to the inquiry other than the location of the investigating office. We did not, however, need to emphasize this point, because the investigation at issue in *ASAT* was unquestionably nationwide in scope. It involved a patent infringement dispute that was proceeding in the District of Columbia, which we described as the "'hub'" of the investigation. *ASAT*, 411 F.3d at 249 (quoting *La Rouche*, 613 F.2d at 857). The subpoenas at issue were directed to three companies, two located overseas and one in California, and the patent infringement investigation was not in any way limited to activities occurring in one locality. *Id.* at 246-47.

12

The dissent also notes that, under § 161(2), an agency may enforce a subpoena in a district court "within the jurisdiction of which [the subpoenaed party] . . . is found or resides or transacts business." According to the dissent, our holding renders this provision superfluous. Dis. op. at 3. Not so. We hold only that, under the specific circumstances of this case, involving a pre-hearing investigation of matters that occurred in Mississippi, the place of the inquiry does not include the District of Columbia. It happens that, in this case, Mississippi would probably qualify as the place of the inquiry and *also* as a place where Cooper Tire is "found . . . or transacts business," but in another case, this conjunction of the provisions of § 161(2) might not exist. Examples include circumstances where a third party is subpoenaed, as occurred in *ASAT*, or where the subject matter of the inquiry is in one state, but additional evidence is sought from another state where the company under investigation transacts business.

Accordingly, we decline to read *ASAT* as undermining the principles we articulated in *La Rouche*. In the present case, we are persuaded that, in the absence of the nationwide investigation present in *La Rouche* and *ASAT*, the district court for the District of Columbia does not have subject matter jurisdiction to enforce the subpoenas. We do not, however, hold that subpoena enforcement in the District of Columbia always requires a national investigation; enforcement in the District, as anywhere else, depends on an application of the factors listed in *La Rouche* and *ASAT*, and a national investigation merely works to tip the scale in favor of the District.

III

The district court lacked subject matter jurisdiction to enforce the subpoenas at issue in this case. Accordingly, we

vacate the order of the district court and remand with instructions to dismiss the case.

*So ordered.*

GRIFFITH, *Circuit Judge*, dissenting: The subpoena enforcement statute for the National Labor Relations Board ("NLRB" or "Board"), 29 U.S.C. § 161(2), authorizes the Board to enforce its subpoenas in a jurisdiction in which its "inquiry is carried on," which we have previously determined encompasses the location of an agency office investigating alleged wrongdoing. Here, that office is in the District of Columbia. The majority, however, concludes that *Federal Election Commission v. Committee to Elect Lyndon La Rouche*, 613 F.2d 849 (D.C. Cir. 1979), contains a "clear requirement that an investigation must be nationwide in scope" in order to enforce a subpoena here based upon an agency's administrative activities in this jurisdiction. Maj. Op. at 11. Because I believe the majority has misread our decision in *La Rouche*, created a conflict with our decision last term in *United States International Trade Commission v. ASAT*, Inc., 411 F.3d 245 (D.C. Cir. 2005), and fashioned a new requirement for agency enforcement of subpoenas that is inconsistent with the plain meaning of "inquiry is carried on," I respectfully dissent.

## I.

It is worth noting how far the majority has departed from a plain reading of the statutory phrase "inquiry is carried on." According to the majority, it means that a District of Columbia-based agency may enforce a subpoena here based upon its administrative activities only when an investigation is nationwide because courts should focus on the subject matter of agency investigations. The majority never explains how a plain reading of § 161(2) supports either its requirement of a nationwide investigation or its assertion that courts should focus solely or especially on the place where allegedly unlawful activity occurred.

Section 161(2) authorizes the Board to enforce its subpoenas in "any district court . . . within the jurisdiction of which the *inquiry is carried on* or within the jurisdiction of which said person guilty of contumacy or refusal to obey is found or resides or transacts business . . . ." *Id.* (emphasis added). The common meaning of "inquiry" is "a request for information" or "a systematic official investigation often of a matter of public interest esp[ecially] by a body . . . with power to compel testimony." *Merriam-Webster's Dictionary of Law* (1996). Where "the statute's language is plain, the sole function of the court[]–at least where the disposition required by the text is not absurd–is to enforce it according to its terms." *Dodd v. United States*, 125 S.Ct. 2478, ___ U.S. ___ (2005) (quotation marks omitted). The text of § 161(2) includes jurisdictions in which the Board interviews witnesses as part of its inquiry, jurisdictions containing the target of its inquiry, and jurisdictions in which it carries on investigative or enforcement tasks related to its inquiry. Thus, before today, our cases have recognized that "inquiry is carried on" includes not only where the alleged misconduct occurred, but also where the Board carries on the administrative aspects of its investigation. *See ASAT*, 411 F.3d at 249-50; *La Rouche*, 613 F.2d at 857; *Fed. Trade Comm'n v. Browning*, 435 F.2d 96, 100 n.7 (D.C. Cir. 1970).

Indeed, the other fora available in § 161(2) for Board enforcement suggest that the purpose of the "inquiry is carried on" phrase is to ensure that the Board can seek rapid enforcement in the forum from which it operates its inquiry.[1] By limiting the "inquiry is carried on" prong to the subject matter

---

[1] The "rapid exercise of the power to investigate" is "the very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation." *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977) (quotation marks and alterations omitted).

of the inquiry yet applying it to administrative activities only for nationwide investigations, the majority renders much of § 161(2) insignificant. "It is our duty 'to give effect, if possible, to every clause and word of a statute.'" *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (citation omitted)). Under the second prong of § 161(2), the NLRB can already enforce its subpoena where the subject of the subpoena is "found or resides." That would almost always include a location where the subject engaged in allegedly unlawful activity, what the majority calls the "subject matter" of the inquiry. Under the majority's construction of "inquiry is carried on," however, there seems to be no need for the "found or resides" prong. A plain reading of these clauses together suggests that Congress sought to give the Board authority to enforce its subpoena either where the target of its investigation is found or resides, or where the Board operates its inquiry.

The majority crafts its nationwide requirement not through a construction of the statute, but by using *La Rouche*, a case that, as I explain below, does not adopt such a requirement. Inherent in the majority's decision today is a policy choice not found in the statutory text: regardless of the convenience to an agency, an agency should not be able to enforce its subpoena in a jurisdiction where the only nexus to its inquiry is administrative activities, unless its investigation is nationwide in scope. Without the majority's nationwide requirement, the plain text of § 161(2) would allow the Board to enforce its subpoena here even though this "investigation concerns a single employer and a single dispute related to union-organizing activity at a single plant." Maj. Op. at 9. But these types of "policy arguments regarding the most efficient or convenient enforcement of [agency] subpoenas are best addressed to Congress." *ASAT*, 411 F.3d at 252. If Congress shares the majority's concerns about subpoenas being enforced here only for nationwide

investigations, it can certainly add that requirement to the statute.[2]

## II.

Last term in *ASAT*, we analyzed *La Rouche* and, under facts nearly identical to this case, upheld the enforcement of a subpoena in the District of Columbia based upon "wholly administrative activities" occurring here. 411 F.3d at 250. Yet nowhere did we conclude that *La Rouche* employed the majority's nationwide requirement. Had we done so, we should have declined enforcement because *ASAT* did not involve a nationwide investigation. 411 F.3d at 246-47.

The majority concludes that it need not apply *ASAT* here because: (1) *ASAT* involved three subpoenas, two of which were directed to companies overseas; (2) the investigation there was not limited to activities in California; and (3) *ASAT* involved a

---

[2] The original bill for what was to become the National Labor Relations Act contained only a "found or resides" clause. Labor Disputes Act, S. 2926, 73d Cong. § 208(2) (as introduced, Feb. 28, 1934). The Senate Committee on Education and Labor added the "inquiry is carried on" clause. S. 2926, 73d Cong. § 208(2) (as reported by S. Comm. on Educ. and Labor, May 10, 1934). In the next Congress, the bill was reintroduced to give the Board even more fora in which to enforce its subpoenas with the addition of a new "transacts business" clause. S. 1958, 74th Cong. § 13(2) (as introduced, Feb. 15, 1935). Congress knows how to limit or expand fora for agency enforcement of subpoenas if it wishes to do so. Indeed, as we noted in *Browning*, the Chairman of the FTC specifically requested that Congress give the FTC the option of enforcing a subpoena in a forum where a corporation or person is found, resides, or transacts business. 435 F.2d at 100-01 (quoting S. 3744, 74th Cong. (1936)). "Congress . . . declined to accede to this request," 435 F.2d at 101, for that agency.

formal hearing being conducted in the District of Columbia. Maj. Op. at 11. The agency in *ASAT*, however, quashed the two international subpoenas for improper service and only the California subpoena was at issue in the enforcement proceedings before this Court. 411 F.3d at 247. Nothing in *ASAT* describes, one way or the other, where the alleged patent infringement under investigation occurred. Moreover, these first two distinguishing facts are culled from the background section of the opinion and none of *ASAT*'s analysis finds them to be of any importance. And in *ASAT*, just like this case, "[t]he subpoena underlying this appeal was issued during an *investigation* by [an administrative agency] . . . ." *Id.* at 246 (emphasis added). The "formal hearing" in *ASAT* of which the majority speaks refers to an "evidentiary hearing regarding [the] actions [of a party under investigation, which] was held in the District of Columbia" by an ALJ, *id.* at 249, apparently with regard to whether investigatory subpoenas should be issued. As the majority notes, Cooper Tire & Rubber Company ("Cooper Tire") litigated the validity of the subpoenas at issue here before the Board in the District of Columbia and the Board issued its decision from here–a proceeding that would not appear to be much different from the evidentiary hearing in *ASAT*.[3]

*ASAT* conflicts with much of the majority's analysis, including the majority's suggestion that our precedent requires us to "focus on . . . the location of the *subject matter* of the inquiry." Maj. Op. at 7 (emphasis in original). In *ASAT*, looking to "wholly administrative activities," 411 F.3d at 250,

---

[3] In any event, *ASAT* expressly held that we would uphold enforcement in the District based upon the administrative activities occurring here "[e]ven if we were to ignore, as ASAT, Inc. suggests, that the ALJ's evidentiary hearing regarding [the] actions [of the party under investigation] was held in the District of Columbia . . . ." *Id.* at 249.

we allowed for enforcement in the District of Columbia of an administrative subpoena directed at a California company because

> the Commission's activities regarding the subpoena at issue were conducted overwhelmingly in the District of Columbia: The subpoena was signed, sealed, and issued in the District of Columbia, the ALJ's rulings on ASAT's motion to quash were issued in the District of Columbia, and the Commission's certification of the subpoena for judicial enforcement occurred in the District of Columbia. Because, as the district court stated, the Commission conducted the administrative activities essential to the investigation in the District of Columbia, the district court here had subject matter jurisdiction . . . .

411 F.3d at 249 (quotation marks, alterations, and internal citation omitted).

We do not focus on any one place or weigh the *ASAT* factors and choose our own preferred forum. Instead, "our precedent is clear that an inquiry can be carried on in more than one place." *ASAT,* 411 F.3d at 250 (citations omitted). As *La Rouche* explained, even if an agency "could have brought [an] action to enforce its subpoenas in [another] district," we acknowledge that "the [agency] chose not to do so, and we honor its choice." *La Rouche*, 613 F.2d at 858 n.9. Interpreting the first part of the *La Rouche* test and our precedent in *Browning*, *ASAT* held that "[a]s long as the [following] factors . . . so indicate, it properly can be said that an inquiry is carried on in that place," *ASAT*, 411 F.3d at 250:

> [1] the place where the Commission held its hearing,
> [2] the place where it made the decision to authorize

the investigation, [3] the place where the subpoenas were issued, [4] the place where its correspondence emanated, [5] the place where the Commission determined that unlawful actions had occurred, [6] the location of the documents and witnesses, and [7] the location of the headquarters of the subpoenaed company.

*Id.* at 249 (citing *La Rouche*, 613 F.2d at 857; *FTC v. MacArthur*, 532 F.2d 1135, 1140 (7th Cir. 1976); *Browning*, 435 F.2d at 99).

Prior to today, with several of the *ASAT* factors met in this case, we would have concluded that the District of Columbia is one place in which the Board's "inquiry is carried on." Here, the NLRB officers investigating Cooper Tire's alleged contempt operate from the Contempt Branch in the Board's District of Columbia headquarters. They have made decisions related to this investigation from there. The subpoenas were issued from the Contempt Branch's District office and were made returnable there. The Contempt Branch will analyze and evaluate the materials subpoenaed from Cooper Tire in that office. The Contempt Branch's correspondence to the parties has emanated from the District and Cooper Tire has sent materials responsive to prior subpoenas to the District. Cooper Tire moved to quash the subpoenas at issue here before the Board in the District and the Board issued its decision from here.

Despite the majority's use of *La Rouche* for its determination to "focus on . . . the location of the *subject matter* of the inquiry," Maj. Op. at 7 (emphasis in original), *La Rouche* also enforced a subpoena in the District of Columbia based upon entirely administrative activities:

[t]he nexus between this jurisdiction and the

> Commission's investigation lies in the fact that the District of Columbia, where the Commission maintains its headquarters, was the hub of the Commission's investigative activity. It was in this jurisdiction where the Commission authorized the auditing of CTEL's records and the interviewing of its contributors, where the Commission determined that there was reason to believe that appellants may have violated the federal election laws, where all correspondence regarding those possible violations emanated, and where the subpoenas were in fact issued.

613 F.2d at 857. The majority bases its holding upon the phrase "subject matter" in the first part of the *La Rouche* test. But in asking "whether the District of Columbia bore a sufficiently reasonable relation to the subject matter of the investigation," *id.* at 856-57 (quotation marks omitted), *La Rouche* did not require that this jurisdiction *contain* the subject matter of an investigation. It asked whether this jurisdiction bore a "sufficiently reasonable relation" to the subject matter of an investigation. And we know from *La Rouche*, *ASAT*, and *Browning* that the presence of a sufficient number of "wholly administrative activities," *ASAT*, 411 F.3d at 250; *see La Rouche*, 613 F.2d at 857; *Browning*, 435 F.2d 96, 100 n.7, will constitute a reasonable relationship with the subject matter of an inquiry. The majority acknowledges a conflict between what *Browning* and *ASAT* require and its own reading of *La Rouche*, but that conflict is one created by the majority and not *La Rouche*.

Despite *La Rouche* having enforced an administrative subpoena based upon wholly administrative activities and the *ASAT* factors having been "derived from *La Rouche*, *MacArthur*, and *Browning*," *ASAT*, 411 F.3d at 250, in order to determine what inquiry-related activities make this a permissible

jurisdiction under the first part of the *La Rouche* test, the majority concludes that the *ASAT* factors are no longer controlling. Instead, under the majority's reading of *La Rouche*, "the nationwide scope of the investigation [is] determinative," Maj. Op. at 10, regarding whether enforcement may be sought in the District of Columbia based upon an agency's administrative activities.[4] *ASAT* did not find this holding in *La Rouche*. Nor did the District Court and Magistrate Judge. Indeed, no court has ever cited *La Rouche* for that proposition in the nearly 30 years since *La Rouche* was decided. To the contrary, after analyzing *La Rouche*, the United States District Court for the District of Columbia has enforced subpoenas involving alleged wrongdoing that takes place in a single state, without finding the majority's nationwide requirement in *La Rouche*.[5]

---

[4] The majority concludes by "not . . . hold[ing] that subpoena enforcement in the District of Columbia always requires a national investigation" and suggesting that "a national investigation merely works to tip the scale in favor of the District." Maj. Op. at 12. Earlier, the majority indicates that *La Rouche* contains a "clear requirement that an investigation must be nationwide in scope . . . ." Maj. Op. at 11. If *La Rouche* so holds, it is unclear why the majority suggests that a nationwide investigation is less than determinative at the end of its opinion and under what standard the majority would weigh the absence of a nationwide investigation.

[5] *See United States v. Tesoro Petroleum Corp.*, 503 F. Supp. 868, 872-73 (D.D.C. 1980) (analyzing *La Rouche* and enforcing in this jurisdiction a subpoena of a Texas-based energy company issued as part of an investigation into whether that company had violated regulations of the Department of Energy because "much of the [administrative] activity concerning the . . . audit [of the company] has occurred in the District of Columbia"), *overruled in part on other grounds by United States v. Hill*, 694 F.2d 258 (D.C. Cir. 1982); *United States v. Stoltz*, 525 F. Supp. 617, 618 (D.D.C. 1981) (same).

10

The portion of *La Rouche* the majority relies upon addresses a party's argument that enforcing a subpoena in the District of Columbia against a contributor to a minor political party could raise a chilling of speech problem under the First Amendment and thereby exceed the bound of reasonableness.[6] That concern,

[6] [A]ppellants argue that a substantial chilling effect would result if the Commission, as part of a nationwide investigation, could enforce in the District of Columbia subpoenas issued to individual contributors to a minor party across the United States.

It is our view that appellants are correct in suggesting that the chilling effect of the Commission's choice of its place of inquiry ought to be considered in determining whether the choice falls within the "bound of reasonableness." In the instant case, however, which of course does not involve subpoenas issued to individual contributors, the record is devoid of any evidence of chill . . . .

What the record does reveal is that the Commission's investigation was not localized in New York, but rather was nationwide in scope. . . . It is our view that here, as in *Browning*, [*FTC v. Cockrell*, 431 F. Supp. 558 (D.D.C. 1977)], and [*United States v. Firestone Tire & Rubber Co.*, 455 F. Supp. 1072 (D.D.C. 1978)], the Commission was conducting an essentially nationwide investigation from its national office in the District of Columbia and, accordingly, it should be afforded broad discretion in selecting this jurisdiction as its place of inquiry. We cannot say, given the breadth of that discretion and the absence of any evidence of chill, that the Commission exceeded the "bound of reasonableness . . . ."

613 F.2d at 857-58 (footnote omitted).

the Court noted, was not present in *La Rouche* because the activities of a national political candidate were at issue. *Id.* at 857. Thus, when *La Rouche* discusses the fact that the investigation in that case was nationwide, it does so only in showing that enforcement here as part of a nationwide investigation cannot exceed the bound of reasonableness. The only decision the majority is able to cite as an example of a court declining enforcement because the activity under investigation occurred in another jurisdiction is not to the contrary. As we explained in *La Rouche*, the District Court in *Federal Trade Commission v. Western General Dairies*, 432 F. Supp. 31 (N.D. Cal. 1977), did not decline enforcement only because there had not been a nationwide investigation; instead, the District Court did so because an agency had "simply [issued] a subpoena . . . from [its] regional office in the Northern District of California" as part of an "investigation [that] was neither nationwide in scope *nor related in any manner to the Northern District of California.*" *La Rouche*, 613 F.2d at 858 n.8 (emphasis added).[7]

Given that the Contempt Branch has carried on a bona fide inquiry of Cooper Tire from its District of Columbia office, *La Rouche* next asks whether allowing enforcement here would exceed a bound of reasonableness. "[T]he [bound of reasonableness] criterion [from *La Rouche*] resembles a traditional venue analysis that focuses on the convenience of the forum to the parties [and] . . . implicates whether that court is a

---

[7] *See Stoltz*, 525 F. Supp. at 619 (nothing that the only connection to the Northern District of California in *Western General Dairies* was an agency's decision to issue, and make returnable, subpoenas from there and that "[w]hether the [administrative] factors present here would have swayed the district court in California cannot be known").

proper venue." *ASAT,* 411 F.3d at 248 (citations omitted).[8] As the Magistrate Judge noted, Cooper directed the District Court to nothing that would warrant restarting litigation in another venue. Cooper did not claim that litigating the legal sufficiency of these subpoenas in the District of Columbia would be burdensome. Indeed, Cooper previously complied with an earlier round of Board subpoenas by producing documents in the District of Columbia. *See NLRB v. Cooper Tire & Rubber Co.*, No. 03-03898, slip op. at 10 (D.D.C. Mar. 29, 2004). In *La Rouche*, the presence of a nationwide investigation was simply one factor that demonstrated that an agency did not exceed the bound of reasonableness. Here, Cooper Tire's prior dealings with the Board in the District suffice to make that same showing. Just as we recently concluded in *ASAT*, Cooper Tire "has demonstrated no actual hardship of defending itself in the

---

[8] *La Rouche*, with limited analysis, applied the Seventh Circuit's statement in *MacArthur* that even if an agency has demonstrated that the forum it has selected is within the literal reach of its subpoena enforcement statute, an agency's "choice . . . is [still] subject to the bound of reasonableness." *MacArthur*, 532 F.2d at 1140 (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 652-53 (1950)); *see La Rouche*, 613 F.2d at 857. The bound of reasonableness of which *MacArthur* spoke is not found in the text of the NLRB's subpoena enforcement statute. *Morton Salt* addresses the Fourth Amendment's protection from unreasonable searches and seizures. *MacArthur* did not explain why the Fourth Amendment, and not due process, is the proper vehicle for a litigant to challenge the fairness of litigating in a particular forum. Courts writing on a clean slate and litigants seeking to make a constitutional claim in this area would do well to avoid relying generally on the bound of reasonableness and to focus instead on a specific constitutional or venue claim. Companies and individual litigants with no connection to the District of Columbia can, of course, make constitutional arguments as to why being forced to litigate the validity of a subpoena here would violate due process. *See, e.g.*, *Quill Corp. v. North Dakota*, 504 U.S. 298, 307 (1992).

13

District of Columbia . . . , especially since it already had participated in administrative proceedings in the District of Columbia," *ASAT*, 411 F.3d at 250, here, at the very least, by responding to the Board's prior subpoenas. "Hence, it is not difficult to conclude that the [NLRB's] choice of the District of Columbia to enforce the subpoena is well-within the 'bound of reasonableness.'" *ASAT*, 411 F.3d at 250 (quoting *La Rouche*, 613 F.2d at 857 (quoting *MacArthur*, 532 F.2d at 1140) (quotation marks omitted)).

**III.**

The NLRB may be able to avoid the majority's nationwide requirement in future cases because its subpoena enforcement statute, unlike the statute at issue in *La Rouche* and that of many other administrative agencies, also allows it to seek enforcement "within the jurisdiction of which said person guilty of contumacy or refusal to obey . . . *transacts business* . . . ." 29 U.S.C. § 161(2) (emphasis added).[9] A large number of agency subpoena enforcement statutes, however, contain only an "inquiry is carried on" clause.[10] The majority's decision now

---

[9] The Board has not argued the "transacts business" clause of § 161(2) in this case. By including jurisdictions in which a subpoenaed party "transacts business," Congress employed a well-traveled standard often found in state long-arm personal jurisdiction statutes, which are frequently interpreted to allow for jurisdiction over an entity to the maximum extent permissible with due process. *See, e.g.*, *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004).

[10] *See, e.g.*, 2 U.S.C. § 437d(b) (Federal Election Commission); 5 U.S.C. § 1507(a) (Merit Systems Protection Board); 7 U.S.C. § 87f(c) (Department of Agriculture); 12 U.S.C. § 2617(c)(2) (Department of Housing and Urban Development); 15 U.S.C. § 49 (Federal Trade Commission); 15 U.S.C. § 796(b)(3) (Federal Energy Administration); 15 U.S.C. § 2076(c) (Consumer Product Safety

places a burden on federal agencies not anticipated by those statutes by requiring agencies that investigate wrongdoing from their District of Columbia offices to enforce their subpoenas in jurisdictions all over the country, unless they can demonstrate that the conduct at issue is nationwide.

Parties that seek to delay agency investigations have a powerful new tool for doing so because there is no ascertainable standard for courts to determine which investigations are "nationwide enough" to allow enforcement in the District of Columbia. The administrative subpoena of a California-based company with an international parent may be enforced in the District of Columbia as part of an unfair trade investigation, *ASAT*, 411 F.3d at 249, as can an administrative subpoena of a Pennsylvania company issued as part of an investigation into that company's acquisition of firms in three states, *Browning*, 435 F.2d at 97-98, as can an administrative subpoena of a New York-based minor political party as part of an investigation into its activities in four states, *La Rouche*, 613 F.2d at 857-58. But the administrative subpoena of an Ohio-based company's activities in Ohio and Mississippi cannot be enforced in the District of Columbia. Maj. Op. at 12.

---

Commission); 19 U.S.C. § 1333(b) (United States International Trade Commission); 19 U.S.C. § 1677f(f)(7)(B) (United States International Trade Commission); 19 U.S.C. § 3433(b) (committees authorized by the North American Free Trade Agreement); 22 U.S.C. § 1623(c) (Foreign Claims Settlement Commission of the United States); 25 U.S.C. § 2715(c) (National Indian Gaming Commission); 38 U.S.C. § 5713 (Department of Veterans Affairs); 42 U.S.C. § 5413(d) (Department of Housing and Urban Development); 42 U.S.C. § 6384(c) (Comptroller General); 47 U.S.C. § 409(g) (Federal Communications Commission); *see also* 41 U.S.C. § 39 (Department of Labor).

Cooper Tire has successfully stalled enforcement of the NLRB's administrative subpoena and has delayed a preliminary investigation by two years. Cooper Tire has forced the NLRB to start anew in Ohio or Mississippi, where Cooper Tire can now file the same briefing it filed in this litigation. As I see no statutory or constitutional basis for placing such a burden on the NLRB, I respectfully dissent.